## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Gary Reed and Thomas Vevea, as
Trustees of the Minnesota Laborers
Health and Welfare Fund and
Minnesota Laborers Pension Fund;
James Brady and Keith Kramer, as
Trustees of the Minnesota Laborers
Vacation Fund; Gary Reed and John
Bartz, as Trustees of the Construction
Laborers' Education, Training, and
Apprenticeship Fund of Minnesota and
North Dakota; and Dan Olson and
Chris Born, as Trustees of the
Minnesota Laborers Employers
Cooperation and Education Trust; and
each of their successors,

        Plaintiffs,

v.

Greenworks, Inc., Greenworks
Landscape Contracting, Inc.,
Greenworks Nursery, and Greenworks
Management,

        Defendants.
_____

Civ. No. 12-72 (JJK)

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER**

Carl S. Wosmek, Esq., and Amy L. Court, Esq., McGrann Shea Carnival
Straughn & Lamb, Chartered, for the Plaintiffs;

Gregory M. Erickson, Esq., and James R. Magnuson, Esq., Mohrman Kaardal &
Erickson, P.A., for the Defendants.

_____

## <u>INTRODUCTION</u>

Plaintiffs brought this action against the four Defendant Greenworks

entities for unpaid fringe benefit contributions that Defendant Greenworks, Inc.
was required to make under the terms of a 2007 collective bargaining agreement.
Plaintiffs moved for summary judgment holding that the four defendants are
jointly and severally liable to the Plaintiffs for all charges, liquidated damages,
and reasonable attorney's fees and costs for the audit period running from
January 1, 2009 through December 31, 2010.  On June 6, 2013, after the hearing
on the summary judgment motion, United States District Court Judge Joan
Ericksen granted summary judgment in favor of Plaintiffs against Greenworks,
Inc., Greenworks Management, Inc., and Greenworks Nursery, Inc., but denied
summary judgment as to Greenworks Landscape Contracting, Inc.  Judge
Ericksen referred the parties to the undersigned Magistrate Judge "for an
evidentiary hearing re liability of Greenworks Landscape Contracting, Inc."  (Doc.
No. 34.)

On November 6, 2013, attorneys representing the four defendants notified
this Court that Chapter 7 bankruptcy petitions had been filed on behalf of each of
the four Greenworks entities, and the automatic stay of this litigation went into
effect.  On June 25, 2014, this Court was notified that, based on the agreement
of the parties, the Bankruptcy Court issued orders in all four bankruptcy
proceedings lifting the automatic stay to permit the parties to pursue their claims
in this matter.  The stay was lifted on July 1, 2014.  (Doc. No. 44.)

2

The parties then consented, pursuant to the provisions of 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73, to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial; order the entry of a final judgment; and conduct all post-judgment proceedings.  On August 1, 2014, the matter was reassigned to the undersigned by Judge Ericksen in accordance with the provisions of 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73.  (Doc. No. 64.)  A bench trial was held on November 4 and 5, 2014, on the liability of Greenworks Landscaping Contracting, Inc.  (Doc. No. 76.)  After post-trial briefing was completed, the matter was submitted to this Court for decision on December 15, 2014.  (Doc. No. 78.)

## **FINDINGS OF FACT**

1. Tom and Karen Grygelko, a married couple, have been in the landscaping business since 1982.  At its inception the Grygelkos incorporated the business as Greenworks, Inc. ("GWI").  Initially, all the stock in GWI was owned by Mr. Grygelko.  In 1990, Mr. Grygelko transferred forty percent of GWI's stock to Karen Grygelko, who was actively involved at that time in the operation of the landscaping business, primarily managing the office, maintaining the books and records, and performing administrative duties.  She also worked, on a part time basis, as a dental hygienist.

2. Throughout its history GWI has employed union landscaping

workers.  It has been bound to a series of collective bargaining agreements ("CBA") that required it to submit fringe benefit contributions to the Minnesota Laborers Health and Welfare Fund, the Minnesota Laborers Pension Fund, the Minnesota Laborers Vacation Fund, the Construction Laborers' Education, Training, and Apprenticeship Fund of Minnesota and North Dakota, and the Minnesota Laborers Employers Cooperation and Education Trust (collectively "Funds") for each hour of its employees' work covered by the collective bargaining agreements.

3.      In 2003, the Grygelkos reorganized their landscaping business and became a so-called double-breasted operation with both union and non-union firms conducting side-by-side business.  GWI was split into four separate entities. GWI became the firm that employed union workers and bid on jobs that required union labor.  Greenworks Landscape Contracting, Inc. ("GLCI") was formed as a separate legal entity.  It employed non-union laborers and competed for jobs that did not require union workers.  At the same time, the Grygelkos also formed Greenworks Management ("GWM"), and Greenworks Nursery ("GWN").   GWM owned the buildings and most of the equipment used by GLCI and GWI.  GWI also employed the estimator who worked on bids for both GWI and GLCI, and provided other services for the Greenworks entities such as obtaining the umbrella insurance policy covering all of the business entities.  GWN grew trees

4

and shrubbery that GLCI and GWI purchased and used on landscaping projects. GWN sold trees to other landscape businesses as well, though the bulk of its sales were to GLCI and GWI.

4.     The Grygelkos formed GLCI so that they could compete for landscaping jobs that did not require union laborers.  The jobs that required union laborers were usually large-scale projects in which the general contractor was a signatory to a CBA and was required to use subcontractors who were bound to a CBA.  Union wage rates including fringe benefit contributions were usually double non-union labor rates, and a bid on a job with union labor would typically be 25 to 35 percent higher than a bid with non-union labor.  When a general contractor invited bids for jobs where union labor was not required, there would be as many as 30 or more non-union landscaping companies submitting bids. James Varty, who has been a landscape job estimator for the Greenworks landscaping business for twenty years, testified that it was very rare for a union landscaping shop to even bid on such jobs because their labor cost structure made competitive bids impossible.  He opined that, for example, GWI would not have been able to obtain any of the non-union required landscaping jobs that GLCI obtained after 2003 because of this competitive structure.

5.     From 2003 to 2007, GWI entered into CBAs governing union landscaping work that were negotiated between the Landscape and Erosion

5

Control Contractors and the Laborers District Council of Minnesota and North Dakota on behalf of its affiliated and local unions, including an agreement in 2003 and another in 2005.  During this time frame, despite conducting periodic audits of the Greenworks landscaping business every two years, the Funds did not raise any claim that GLCI, the non-union side of the Greenworks' double-breasted business, was liable for fringe benefit contributions on behalf of its non-union employees.  In 2008, for the audit period prior to the one at issue, Plaintiffs claimed $6,382 in unpaid fringe benefits for GWI's workers, an amount which was paid by GWI, but Plaintiffs made no claim that GLCI or GWI was liable for any fringe benefit contributions for GLCI's employees.

6.      In 2007, the landscape contractors and union representatives negotiated a new form of CBA.  Previous agreements had bound the companies that were signatories to the agreement to its terms.  This was expanded in the 2007 agreement by the addition of the following language:

> Companies engaged in Landscape Work as defined in Article 2 who are signatory to this Agreement, hereinafter called Employers or Contractors, or any person, firm, partnership, corporation, joint venture or other legal entity owned or operated or substantially under the control of the Employer or one or more principal(s) of the Employer; or a subsidiary of the Employer; or any person, firm, partnership, corporation, joint venture or other legal entity which owns, operates, or substantially controls the Employer are parties to this Agreement as principals.

(Def. Ex. 2 at § 1.1.)

7.      Given the new language in the 2007 CBA, the Grygelkos decided to

reorganize their ownership interests in GWI and GLCI because of a concern that the collective bargaining agreement would be enforced against GLCI if Tom Grygelko had any ownership interest in GLCI.  On April 30, 2007, Tom Grygelko assigned and transferred all of his stock in GLCI to Karen Grygelko, and he resigned from GLCI's Board of Directors and from any officer positions of GLCI. Since that date, Karen Grygelko has been the sole owner of GLCI.  Conversely, at the same time, Karen Grygelko assigned and transferred all of her stock in GWI to Tom Grygelko.  He has been the sole owner of GWI since then.  These transfers were accomplished three months before Tom Grygelko signed the "To Be Bound Form" to the 2007 agreement on behalf of GWI.  The transfers were evidenced by stock assignments, though no payment was made.

8.     On July 13, 2007, Tom Grygelko, on behalf of GWI as its President, signed the CBA with the Laborers' District Counsel of Minnesota and North Dakota on behalf of its affiliated unions.  The To Be Bound Form attached to the CBA did not refer to GLCI.  It stated that:  "Greenworks, Inc. agrees to be bound as an individual employer to the Minnesota Landscape and Erosion Control Contractors and Laborers' District Counsel of Minnesota Collective Bargaining Agreement effective May, 2007; expires April 30, 2011."  In the agreement, GWI agreed to pay fringe benefits to a variety of funds for the benefit of its union employees.  (Def. Tr. Ex. 2.)

9.     There was no discussion between the Grygelkos and the union about GLCI, a business which had been operating as the separate non-union part of the landscaping operation for the four years prior to the execution of the 2007 CBA, being required to sign the agreement.  Karen Grygelko, who was President and sole owner of GLCI in July, 2007, testified that she would not have agreed to sign the CBA if she had been requested to do so because "to be competitive, we had to have this other company [GLCI].  That was the only company that was getting work, and even then it was lean during those 2009 or 2011 years."  (TT.  62.)[1]

10.     After the 2007 agreement was signed, the Grygelkos continued to operate the separate union and non-union businesses under the Greenworks umbrella.  Karen Grygelko, who became the sole owner of GLCI in 2007, actively managed the GLCI business, as its President, on a daily basis.  GLCI hired its own non-union work force that typically consisted of ten to fifteen workers.  Karen Grygelko hired the GLCI workers.  GLCI had its own payroll and kept its own separate books and records.  Karen Grygelko signed GLCI's separate tax returns.  GLCI had its own office space in the building that the Greenworks businesses used.  When bids were solicited for landscaping jobs, estimator Jim Varty would analyze it, and if the job was for non-union work, he and Karen

---

[1]  "TT." refers to the trial transcript.

Grygelko would work on submitting a bid for GLCI to do the work.  Karen

Grygelko would, for example, track the status of the bid with the project manager,

edit proposed contracts, obtain insurance certificates and schedule the jobs.

Tom Grygelko would often assist on the GLCI bids, particularly on the cost of

trees, because of his nursery experience, but Karen Grygelko had the final say

on GLCI bids, as President of GLCI.

11.    The construction trades were hit hard by the economic recession in

2008 and a few years thereafter.  GWI's business was adversely affected

because the large scale projects that used union labor dried up.  When GWI had

insufficient projects to occupy its union laborers, GLCI would sometimes allow

union laborers to work on GLCI jobs to keep them working.  This would always

be documented, and the fringe benefits required by the CBA would be paid on

behalf of GWI's union laborers, a practice which reduced GLCI's profits because

these GLCI jobs were not bid to be performed with union labor.  However, both

Tom and Karen Grygelko had close relationships with the employees of both

GWI and GLCI, and wanted to support them as much as possible during the

recession when union jobs came to a virtual halt.  Further, both GLCI and GWI

loaned workers to GWN to work in the nursery, but only when they had free time.

Karen Grygelko would make the decision to loan GLCI workers for work in the

nursery and Tom Grygelko would make the decision to loan GWI workers.

12.     Although Karen Grygelko was trained as a dental hygienist and throughout her career has always continued her part-time work as a hygienist, her testimony demonstrated that she was a competent and engaged business person who directed the day-to-day landscaping operations of GLCI after 2003. She controlled GLCI's finances, made hiring and firing decisions, and made decisions on which jobs GLCI would bid on.  She was the only person who was authorized to sign contracts on behalf of GLCI and sign GLCI's tax returns. Although Karen Grygelko worked closely with her husband in the landscaping business, and each brought particular skills to the operation, the weight of evidence did not show that Tom Grygelko or GWI, the union-shop business owned by Tom Grygelko, controlled Karen Grygelko or GLCI.  Karen Grygelko was by no means simply a paper-only owner of GLCI.

13.     Neither GLCI or GWI were shell businesses.  GLCI employed ten to fifteen non-union employees during the 2007 to 2011 time period in question, with GWI employing five to seven union employees.  GWI had revenues of approximately $300,000 per year, while GLCI had revenues of approximately twice that amount.  GWI and GLCI had specific procedures for bidding jobs, paying employees and doing landscape work.  The Grygelkos bore the cost of operating GLCI and GWI as separate and distinct legal entities.  There was no evidence that GLCI, either in the four years before the 2007 collective bargaining

agreement, or thereafter, was operated as a ruse or mere façade to avoid paying

fringe benefits to workers covered by the agreement.  GLCI was formed and

openly operated as a separate business entity so that it could effectively compete

for landscaping work that did not require union labor.  There was no evidence

that GLCI was insufficiently capitalized.  There were no dividends paid for GLCI,

but given the financial pressures GLCI faced, this is hardly surprising in a closely

held corporation.  Neither GWI nor GLCI were insolvent at the time of execution

of the CBA.  Tom Grygelko did not siphon funds from GWI, nor did Karen

Grygelko take funds from GLCI.  Indeed, Karen Grygelko took only a small salary

from GLCI, Tom Grygelko took no salary from GWI after 2010, and the Grygelkos

together contributed over $500,000 from their own savings to keep the

Greenworks businesses, particularly the union shop GWI, operating with union

member employees until the CBA was terminated in 2011.  There is no evidence

that GLCI was used as a front for "personal dealings."  Karen Grygelko and Tom

Grygelko were sole officers and shareholders for GLCI and GWI, respectively.

There was no absence of corporate records, as both GWI and GLCI kept

corporate minute books, and  submitted separate corporate tax returns.  GLCI

was at all times actively operating as a landscaping company, bidding on non-

union projects.

    14.    The Grygelkos were operating a small, family-owned-and-operated

landscaping business, and although corporate formalities were observed, and

Karen Grygelko and Tom Grygelko exerted independence in their own spheres of

the business, there was still some overlap in the business operations.  As might

be expected in a small family enterprise, this was not run like a Fortune 500

company with separate divisions, independently managed subsidiaries, and

firewalls keeping the various parts of the business apart.  For example, funds

were regularly transferred between GWI, GLCI, GWN and GWM as money was

needed to keep operations going.  These transfers were booked as loans for

accounting and tax purposes, but promissory notes were not used, and payment

schedules were not set up or adhered to.  The primary beneficiary of these

transfers was the union-shop GWI, which was in a very unpredictable business

position due to the radical drop in demand for union jobs, so much so that the

Grygelkos' accountant recommended that it be shut down.  Karen Grygelko,

however, made the independent decision to continue to assist in keeping GWI in

business as long as possible, and she approved the transfers from GLCI to GWI

which netted out to approximately $180,000 over the time period in issue.

15.    There were other ways in which the four businesses did not keep a

neat separation.  GLCI and GWI would each use the services of the

management company GWM, but a clear structure of allocating those costs and

reimbursing them was not set up.  Tom and Karen Grygelko personally owned

the land and buildings where the offices were located, but they collected little or no rent from the four companies during the time period in issue because the money was too tight.  GWI and GLCI had separate loan obligations to Farmers State Bank of Hamel, but the bank required that the loans be cross-collateralized across the Greenworks entities.  To save money, GWI and GLCI had a common insurance policy procured by GWM that could be used to cover both GWI and GLCI jobs.

16.    Although Karen Grygelko was actively involved in making day-to-day decisions about GLCI, she was not, of course, isolated from her husband, who was working with her every day.  For example, when the estimator was determining the amount to bid for either a GWI or GLCI job, he would consult with Tom Grygelko because of Tom's expertise with the nursery operations. GLCI employees were directed to Tom Grygelko if they had questions or concerns regarding GLCI policies or safety.  And Tom Grygelko assisted Karen Grygelko by meeting and interviewing GLCI's prospective employees.  It is clear that Tom Grygelko had been the face of the Greenworks business for some thirty years, and it is not surprising that customers, contractors or suppliers would not draw a fine line between GWI and GLCI.  General contractors sometimes issued payments to GWI on projects awarded to GLCI.  Some lien waivers were executed by GWI on GLCI projects.  In several instances GWI submitted certified

payroll records on projects awarded to GLCI to the project owner and general

contractor.  There were times when vendors mixed up GLCI and GWI and thus

sent correspondence, invoices or proposals to the wrong entity, and the mistakes

were not corrected.  An insurance provider on a GLCI project once corresponded

with Tom Grygelko at GWI for a claim made on a GLCI project.  A W-9 for GWI

was once provided to a general contractor for a project awarded to GLCI, and

GWI issued a warranty to a general contractor on a GLCI job.  Taken together,

however, these acts do not establish that either GWI or Tom Grygelko controlled

GLCI, such that GLCI had an independent existence in form only.

17.     Karen Grygelko, as President and sole owner of GLCI, was the only

person who could sign checks for GLCI on contract documents.  Plaintiffs found,

in GLCI's records, instances where Tom Grygelko signed checks, including some

payroll checks and checks for suppliers or others.  These all appear to be

instances where Karen Grygelko delegated this to Tom Grygelko so that workers

could get paid or business could be done.  Plaintiffs found instances where Tom

Grygelko signed correspondence on behalf of GLCI, including two occasions

where he signed as GLCI's President and another where he signed a

subcontract as its President.  Plaintiffs found that he also signed some lien

waivers on behalf of GLCI.  Plaintiffs further point to instances when Tom

Grygelko was actively involved in the GLCI business operations and appeared to

hold himself out as having authority to bind GLCI.  For example, on two occasions he signed correspondence indicating he was President of GLCI, and on another occasion he executed a GLCI subcontract as its President.  He corresponded with general contractors on a few occasions regarding GLCI change orders, contract pricing, and moneys due GLCI.  He executed some lien waivers and a release on behalf of GLCI.  Taken together, however, these acts do not amount to Tom Grygelko exercising substantial control over GLCI, nor to an evisceration of the independent identity of GLCI.

## CONCLUSIONS OF LAW

### A. Breach of the 2007 CBA

GLCI did not breach the 2007 CBA by failing to make contributions to the Funds pursuant to the agreement in which GWI and Tom Grygelko are purported to have bound any company or entity owned or substantially under the control of GWI, or Tom Grygelko, as principals to the CBA.  GLCI and its President, Karen Grygelko, were not signatories of the CBA and GLCI is an independent company, having separate ownership and management.  Also, GLCI was not operated in a manner that indicated an effort by CLCI to take advantage of the benefits to be obtained under the CBA without incurring the obligation of an employer under the CBA.  Finally, GLCI was not substantially controlled by Tom Grygelko or GWI.

## B.  Alter Ego

GLCI is not the alter ego of GWI or Tom Grygelko, and GLCI is not liable for payment of fringe benefit contributions to the Funds on an alter ego theory. GLCI was an independent and separate non-union landscaping company that was not controlled by GWI or Tom Grygelko to an extent that its separate existence was a charade, and CLGI was not established or used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetuate a fraud.

## **ORDER**

**IT IS HEREBY ORDERED** that:

1.    The claims against Greenworks Landscape Contracting, Inc. are dismissed with prejudice.

2.    Defendant Greenworks Landscape Contracting, Inc.'s Motion for Verdict on Partial Findings is **MOOT**.  (Doc. No. 79.)

3.    In accordance and in conjunction with the grant of summary judgment against Defendants Greenworks, Inc., Greenworks Nursery, and Greenworks Management (Doc. No. 34), Plaintiffs shall submit an itemized motion for damages and other relief allowed by law against these three Defendants consistent with the dismissal of the claims against Greenworks Landscape Contracting, Inc.  This damages motion shall be served and filed by February 20, 2015.

16

4.     The attached Memorandum is hereby incorporated into the above Findings of Fact and Conclusions of Law.


Dated:  January 27, 2015

_s/*Jeffrey J. Keyes*_____
JEFFREY J. KEYES
United States Magistrate Judge


## MEMORANDUM

### A.  Breach of the 2007 CBA

Section 515 of ERISA provides that every employer obligated to make contributions to a multi-employer benefit plan must make such contributions according to the terms of the plan or applicable collective bargaining agreement. 29 U.S.C. § 1145.  GWI became bound to make fringe benefit contributions to the Funds on behalf of all the GWI employees covered by the collective bargaining agreement to which GWI became a signatory on July 13, 2007. Plaintiffs contend that even though GLCI did not sign on to be bound by this CBA, it nevertheless also became obligated to make fringe benefit contributions to the Funds on behalf of all its employees, none of whom were union workers, when those employees were performing landscape work.  Plaintiffs base this claim on a section of the CBA which designates as "parties to this Agreement as principals" the employer signatory (*i.e.* GWI) "or any person, firm, partnership,

17

corporation, joint venture or other legal entity owned or operated or substantially under the control of the Employer or one or more principal(s) of the Employer; or a subsidiary of the Employer; or any person, firm, partnership, corporation, joint venture or other legal entity which owns, operates, or substantially controls the Employer …".  (Def. Tr. Ex. 2 at § 1.1.)  Plaintiffs contend that GLCI became a "responsible contracting party" to the collective bargaining agreement because it was substantially under the control of GWI or Tom Grygelko, President of GWI.

Tom Grygelko, who signed the "To Be Bound Form" in July 2007, on behalf of GWI, was not an owner, officer, employee or principal of GLCI, and there was no evidence that Tom Grygelko purported to sign the CBA on behalf of GLCI.  "In general, only a party to a collective bargaining agreement is bound by its terms . . . ."  *Crest Tankers, Inc. v. Nat'l Mar. Union of Am.*, 796 F.2d 234, 237 (8th Cir. 1986).   "To the extent an individual signs an agreement purporting to bind related entities, the person so signing must first have authority to act for those separate and distinct entities."  *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1 M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 727 (8th Cir. 2008).   Tom Grygelko had no express authority from GLCI to bind GLCI to the collective bargaining agreement, as he was not an officer, principal or even an employee of GLCI, and Karen Grygelko, owner and President of GLCI, did not, and would not have, granted him any such authority.  And Tom Grygelko had

no implied authority to bind GLCI.  Neither Karen Grygelko nor Tom Grygelko

ever made any statements to induce reasonable reliance that Tom Grygelko had

any such authority.  While GWI could obligate itself to the terms of the CBA, it

could not obligate GLCI, a related entity, without consent from GLCI, which it did

not have.  *See Bjorkedal*, 516 F.3d at 727.  GLCI did not become obligated to

make fringe benefit contributions on behalf of its employees, none of whom were

union members, under the terms of a CBA it did not sign.

This conclusion is supported by the history of the dealings between GWI,

GLCI, the union and the Funds in the four years before the 2007 CBA.  In 2003,

the Greenworks enterprise started operating a "double-breasted" business

operation.  During that four year period of time, GLCI had its own non-union

workforce and bid on projects that would use non-union labor.  GLCI obviously

did not take on any of the obligations of a collective bargaining agreement with

the union, such as paying union wages and making fringe benefit contributions,

and it did not have any of the benefits of such an agreement, such as the ability

to work on projects that required union labor.  Despite conducting biennial audits

of the Greenworks operation in the 2003 to 2007 period, the Funds raised no

issue about GLCI being obligated to make fringe benefit contributions on behalf

of its non-union employees.  And the union made no claim that the double-

breasted operation violated GWI's obligations under the CBA or otherwise.  The

union never took the position that GLCI's workers were required to join the union

or that GLCI had collective bargaining obligations under the CBA.  Given this

history, if the union or the Funds expected that GLCI was going to radically

change the way it was doing business in 2007, and was going to start operating

as a union shop (*i.e.* hiring union workers, paying union wages, recognizing

union stewards, making fringe benefit contributions), then it was incumbent on

the Funds to obtain GLCI's specific agreement to be bound by the CBA as a

signatory to the agreement.  Obtaining GWI's agreement to be bound with other

entities as a single employer did not suffice.

The conclusion  that GLCI is not obligated to make the fringe benefit

contributions for its employees is also reinforced by the ambiguity in the 2007

CBA about just what GLCI's obligations would have been if it were found to be,

per the language of Section 1.1 of the CBA, one of the "parties to this

Agreement as principals."  The CBA does not set forth exactly what obligations,

if any, a "party as a principal" takes on, nor does it explain what this term means.

As far as fringe benefit contributions are concerned, the CBA only says that the

*employer* must make the contributions for each hour worked by all employees

covered by the agreement.  (Def. Tr. Ex. 2 at Art. 16.) It is clear that the

Employer is the company that signs the CBA.  (*Id.* at § 1.1. (" Companies

engaged in landscape work as defined in Article 2 who are signatory to this

agreement, hereinafter called Employers . . .").)  No such obligation is placed upon any other party to the agreement.  When the party is not even a signatory to the agreement, but is simply drawn into the agreement because of its relationship with the signatory, there is all the more reason to insist upon clear consent.

In the end, however, what sinks Plaintiffs' breach of contract claim is that they failed to prove that either GWI or its principal, Tom Grygelko, "substantially controlled" GLCI.  This is not only due to the fact that Karen Grygelko, not Tom Grygelko or GWI, owned the stock of GLCI.  The evidence showed that Karen Grygelko was actually in substantial control of GLCI.  GLCI had its own employees who were hired by Karen Grygelko. She oversaw the bidding done by GLCI on the non-union jobs; she consulted with the skilled estimator about the amount of bids; and she ultimately made the decision about which jobs GLCI would take on.  She kept the books and records, signed the contracts, signed tax returns, had sole authority to sign checks, and managed the day-to-day operations of the office.  There is no doubt that Tom Grygelko was actively involved in the business on a day-to-day basis, but Plaintiffs failed to prove that this involvement amounted to his exercising substantial control over GLCI.  It was clear from the testimony that Karen Grygelko's management role over GLCI was enhanced when she took on sole ownership of GLCI in 2007.  This was a role

she was quite ready to accept and did assume.  (("Well, if you think he controlled me, you're wrong.  I mean I knew I was - - I knew I - - you know, I almost felt I was getting my just dues when I finally got control of the company, because I was doing as much as he was when it was Greenworks, Inc.") (TT. 47).)   And Plaintiffs presented no proof that GWI substantially controlled GLCI.  Although substantial amounts of money were transferred back and forth between GLCI and GWI, Karen Grygelko controlled those transfers, and to the extent that money flowed to GWI, it was the result of Karen Gyrgelko's decision that it was in the best interest of GLCI to keep GWI afloat through the hard times of the recession, and this was motivated in no small part by her concern for the union workers' welfare.

## B.  Alter Ego

Plaintiffs argue, in the alternative, that GLCI should be liable for fringe benefit contributions on behalf of its non-union workers because GLCI is merely the alter ego of GWI and, as such, it is liable, like GWI, under the collective bargaining agreement, as the employer which must make the fringe benefit contributions when employees do covered landscaping work.  The alter ego doctrine as developed under corporate law principles provides that the legal fiction of the separate corporate entity may be rejected in the case of a corporation that "(1) is controlled by another to the extent that it has independent

existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." G*reater Kan. City Laborer's Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 2004); s*ee also  Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512-13 (Minn. 1979).   The application of this corporate law standard for determining alter ego status strikes an appropriate "balance between the congressional intent of ERISA and the long-established principle that a corporation's existence is presumed to be separate and may be disregarded only under narrowly prescribed circumstances." *Superior Gen. Contractors*, 104 F.3d at 1055.

These two requirements of: (1) loss of an independent existence to another's control, and (2) an element of wrongdoing, are best viewed together, with particular emphasis on the need to show some inequitable result from the arrangement between the two alter-ego entities.  In this context, there is nothing wrong, in and of itself, with one company controlling another.  It is only when the control of the puppet company by the puppet master is "used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud" that liability can arise.  *Id.*

To property analyze the applicability of the alter ego doctrine to this case, it is necessary to begin by examining the nature of the harm that the Funds

allegedly suffered as a result of the way GLCI and GWI conducted business.

When an employer is bound to a CBA and fails to make required fringe benefit

contributions, the Funds may be required to provide benefits to employees for

work covered by the CBA even if the Funds did not collect the contributions from

the signatory employer.  At trial, the Funds' administrator testified that the Funds

trustees must collect contributions on behalf of employees performing work

covered by a collective bargaining agreement.  The Funds set up an account for

each such employee and the contributions collected on the employee's behalf

are credited to the employee, regardless of whether the employee is a member

of the Union.  (TT. 154--156.)  So the harm to the Funds if GLCI failed to make

required fringe benefit contributions is that the Funds may have to make those

contributions so that the benefits are funded.   To prove its alter-ego claim,

Plaintiffs would have to show that GLCI was wrongfully used as a device to avoid

making benefit contributions that were due under the CBA and which now may

become the liability of the Funds.

　　　GLCI had a separate, independent existence from GWI and was not

required to adhere to the terms of the CBA to which GWI agreed to be bound.  In

2003, when GLCI was formed, there was not a mere technical change in the

structure or identity of GWI.  GLCI had its own staff of ten to fifteen landscape

workers, none of whom were members of the union.  It had its own payroll, hired

its own workers, decided what jobs to bid on, kept its own books and records, and paid taxes on its own tax returns.  GLCI had annual revenues of about $600,000 per year.  Karen Grygelko was the sole owner and President of GLCI at all times relevant here, and she actively managed the day-to-day affairs of the company.  The Grygelkos set up GLCI in 2003 for the legitimate business purpose of competing in the highly competitive market for landscaping jobs that did not require union labor.  And that is exactly what GLCI did throughout the period of time in issue.  The evidence at trial showed that it was highly unlikely that GLCI could have made any profit at all if it had to pay union wages and benefits on the jobs it was able to obtain that did not require union labor during the recessionary period of 2007 to 2011.  Estimator Jim Varty testified that he could not think of a single job that he bid for GLCI that GWI could have received. (TT. 223.)  Indeed, the limited success that GLCI had during that period inured to the benefit of the union operation GWI because it helped the Grygelkos keep their landscaping business afloat.  It enabled GLCI from time to time to give some work to idle union workers on GLCI projects, and whenever that occurred, GLCI paid their union wages and made the benefits contributions to the Funds.  It also enabled GLCI to transfer thousands of dollars to GWI during this time frame to keep GWI, the union shop, afloat.  And it helped the Grykelkos make personal loans to the companies of approximately $500,000 at a time when there were no

profits from the businesses and only Karen Grygelko was taking a small salary.

In operating their small landscape business, the Grygelkos did not completely separate GWI and GLCI.  As the recitation of the facts shows, Tom Grygelko played an active role assisting in the management of GLCI, including providing assistance in the bidding of jobs, hiring workers, and management of field operations.  On occasion Tom Grygelko signed GLCI's payroll, checks, corresponded on behalf of GLCI, and even signed some correspondence as President of GLCI.  It is also true that the Grygelkos did not always strictly adhere to formalities in keeping the operation of the four entities separate.  Substantial funds were transferred between GLCI, GWI, GWM and GWN as they were needed to keep the landscaping business going, but there were seldom formal written agreements and loan documents used.  From time to time mistakes were made and payments on GLCI projects were received by GWI, and vice versa. Some lien waivers were executed by GWI on GLCI projects, vendor proposals and invoices were sent to the wrong entity, and other such mix-ups occurred. But none of this amounts to a showing that GLCI lacked an independent existence and was used as a subterfuge to perpetuate a wrongdoing or fraud. Thus, Plaintiffs failed to prove that GLCI should be held liable as an alter ego of GWI for making fringe benefit contributions under the 2007 CBA.

JJK